# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO STATE UNIVERSITY FACULTY ASSOCIATION FOR THE PRESERVATION OF THE FIRST AMENDMENT, an Idaho Unincorporated Nonprofit Association, | Case No. 4:12-cv-00068-BLW |
| | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | |
| IDAHO STATE UNIVERSITY, ARTHUR VAILAS, and BARBARA ADAMCIK, | |
| Defendants. | |

## INTRODUCTION

In this case, the Court must determine whether Idaho State University violates the First Amendment rights of some of its faculty when it prevents them from using a university-moderated and university-controlled listserv to distribute email communications which are at odds with positions taken by the university administration. The Court concludes that it does not.

To state the obvious, plaintiff's members are university professors – public employees. Of course, individuals do not relinquish their First Amendment rights just by accepting employment with a state university. But, when faculty members speak concerning job-related matters – including communicating with other faculty members using a university-controlled listserv – they speak not as private citizens, but as public employees. Under those circumstances the messages communicated by the public

employee may be seen as reflecting the university's own position, and the university is therefore free to "take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Otherwise stated, when the university opens its own mouth to speak, individual faculty members do not have the right to "play ventriloquist." *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000).

Here, plaintiff concedes that the professors do not wish to speak as private citizens. They admit that all the speech at issue is job-related. This concession, coupled with the university's control and moderation of the listserv in question, basically ends the analysis. Plaintiffs are not entitled to relief under the governing legal framework established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), as applied by the Ninth Circuit in *Johnson v. Poway Unified School District*, 658 F.3d 954, 961 (9th Cir. 2011).

## FACTUAL BACKGROUND

The Plaintiff and the Defendants have jointly stipulated to all facts contained in this Memorandum Decision and Order. *See Joint Stipulation*, Dkt. 29.

Plaintiff, the Idaho State University Faculty Association for the Preservation of the First Amendment, alleges that ISU and certain university officials have violated its members' First Amendment rights. More specifically, the association contends that defendants have improperly prohibited members of ISU's provisional faculty senate from sending email messages through an ISU listserv called facultymemos.

Facultymemos is not a "listserv"[1] per se. It is an email list created through "Mailman," which is the university's mass email service. Mailman allows the university to create various emailing lists – including, for example, facultymemos, staffmemos, and studentmemos. As the name "facultymemos" suggests, if a person wishes to send an email to the faculty at large, they simply type in a single address and the email is sent, en masse, to the entire faculty.

The parties' dispute over facultymemos erupted in November 2011, when members of ISU's provisional faculty senate wanted to circulate a draft constitution via facultymemos. The provisional faculty senate had been created roughly six months earlier, in April 2011, and was tasked with developing a new constitution and bylaws for a full faculty senate, to be approved by the ISU President and the State Board of Education. By early November 2011, the provisional faculty senate had a draft constitution ready for circulation to the faculty. The vice chair of the senate, Dr. David Delehanty, attempted to send the draft constitution to the entire faculty – via facultymemos – for a vote. According to Dr. Delehanty's email, the faculty would have had a little over a week to ratify or reject the draft constitution. *See Ex. F. to Cole Dec.,* Dkt. 2-2, at 18.

The university's Vice President of Academic Affairs, Dr. Barbara Adamcik, did

---

[1] Plaintiff describes facultymemos as a "listserv." Wikipedia describes LISTSERV as a "the first electronic mailing list software application consisting of a set of email addresses for a group in which the sender can send one email and it will reach a variety of people." *See* www.wikipedia.org (entry for LISTSERV; last visited Mar. 1, 2012). After LISTSERV's 1986 launch, other list management tools developed. *Id.* It appears that ISU's list management tool – Mailman – was one of these later list management tools. For ease of reference, the Court sometimes generally refers to facultymemos as a "listserv."

not want the draft circulated via facultymemos at that point, however. As she explained in a November 11, 2011 letter to the faculty, she did not believe the review process was complete and wanted the faculty to have more time to discuss the draft. *See Nov. 11, 2011 Letter from Barbara Adamcik to Faculty, Ex. H to Cole Aff.*, Dkt. 2-2, at 23. She also had substantive disagreements regarding the contents of the draft constitution. For example, she wanted the constitution to acknowledge the university's president "as being a member of and president of the faculty." *Id.* at 24. Additionally, the "administration believe[d] there should be a reasonable threshold of criticality for faculty to initiate a referendum to revisit an action or decision made by the President, a vice president, a dean, etc." *Id.*

Dr. Adamcik thus refused to allow the senate to use facultymemos to circulate the constitution. She explained her reasoning as follows:

> I, on behalf of the Administration disagreed with the plan to conduct a faculty poll relating to the proposed Constitution in mid-November when the faculty was very busy concluding the fall semester's work. I did not want the official "facultymemos" Mailman List to be used to organize the polling because it would give the mistaken impression that the poll was sanctioned by the Administration. Since the Administration had a legitimate disagreement with the PFS [provisional faculty senate] about the poll, we did not want to mislead the members of the faculty by allowing the University's official "facultymemos" Mailman List to be used. It is my belief that the sole reason the ISU-PFS sought to use the official "facultymemos" Mailman List, as opposed to numerous other options available to it . . . was to foster this misrepresentation of University Administration sanctioning of the poll.

*Adamcik Dec.,* Dkt. 10-1, ¶ 26.

As for the "numerous other options" referred to, Adamcik explains that the provisional faculty senate could have circulated the draft constitution by creating its own

Mailman list, by sending the constitution through the university's general email system, or by posting the constitution on the provisional faculty senate's university-provided website. *See Adamcik Aff.* ¶¶ 17-20. Drs. Cole and Delehanty, however, were not satisfied with these alternatives; they wished to use the facultymemos listserv.[2]

Drs. Cole and Delehanty say that before November 8, 2011 (when they wanted to circulate the constitution), they were able to send emails directly to the facultymemos email address without any prior approval from the university. They also point to one specific communication – a holiday greeting card from the Idaho Historical Museum – that they say was sent directly to all faculty using the facultymemos mailing list. Vice President Adamcik, however, says that "[n]o University employee, faculty member or student has ever been able to use their personal email addresses on the University's regular email service to *directly* post to the University's 'facultymemos' Mailman List without moderation by the University or its I.T. staff . . . ." *Adamcik Aff.*, Dkt. 10-1, ¶ 27 (emphasis in original).

In any event, right around the time the senate and the administration were embroiled in their dispute about the use of facultymemos, the Idaho Supreme Court handed down its opinion in *Sadid v. Idaho State University*, 265 P.3d 1144 (Idaho 2011). The provisional faculty senate asked permission to circulate this opinion via facultymemos. Adamcik said that the senate could post the decision on its website, but refused to allow the senate to circulate it via facultymemos.[3]

_____

[3] The *Sadid* opinion has no direct relevance to the provisional faculty senate's work or to

In the *Sadid* case, ISU professor Habib Sadid alleged that the university had retaliated against him because of his comments criticizing the administration that had been published in a local newspaper over several years. Sadid sought damages under 42 U.S.C. § 1983 on the grounds that the university had violated his constitutional free speech rights. The trial court granted summary judgment in the university's favor. 265 P.3d at 1148. The Idaho Supreme Court affirmed, concluding that there was no evidence that the university had retaliated against Sadid. *Id.* at 1154-54. The court did, however, overrule parts of the lower court's ruling. For example, it concluded that Sadid's comments were protected by the First Amendment because he was speaking as a private citizen on a matter of public concern. *Id.* at 1149-51.

## ANALYSIS

### A.    Standing

At the outset, the Court must address defendants' contention that plaintiff lacks standing.

Plaintiff relies on the doctrine of associational standing. Under that doctrine, an association may sue on behalf of its members, even if it has not itself suffered an injury. To obtain associational standing, the association must show that (1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

this case although both Sadid and the plaintiff in this case share the same counsel. Additionally, Dr. Delehanty provided a supporting affidavit for Sadid in his lawsuit.

*E.g., Fleck & Assoc. Inc. v. Phoenix*, 471 F.3d 1100, 1105-06 (9th Cir. 2006) (citations omitted).

The first requirement listed – a member's standing to sue in his or her own right – triggers another three-part inquiry. First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted); *see also Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-104 (1998) (the "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement").

Here, defendants argue that the faculty association lacks standing because the entity allegedly harmed is ISU's provisional faculty senate, which is not a member of the faculty association. Defendants also argue that the associations' individual members fail to allege they were harmed by defendants' actions. The Court disagrees.

Although the complaint primarily concerns the work of the provisional faculty senate, it also alleges that individual professors have been unable to send emails. *See Compl. ¶¶* 16, 42, 55, 63. For example, plaintiff alleges that Philip Cole (the chair of the provisional faculty senate) has been unable to send messages via the facultymemos listserv. *See, e.g., id.* ¶ 63. Dr. Cole has also filed an affidavit stating that his email address has been "blocked." *See* Feb. 13, 2012 Cole Aff., Dkt. 2-2 ¶ 18 ("since

November 8, 2011 . . . the email address for the PFS, fsenate, *and my email, colephil*, are unable to send an email directly to Facultymemos.") (emphasis added). The individual members have therefore allegedly suffered an "injury-in-fact."

The Court also concludes that plaintiffs have alleged facts sufficient to meet the causation and redressability standing elements. Plaintiff alleges that defendants have blocked and continue to block its members' alleged right to use the facultymemos listserv. If the Court determines that this prohibition is improper, it is likely that the alleged injury would be redressed by a favorable decision. The faculty association thus has standing to bring this action.

**B.      The First Amendment Claim**

Plaintiff contends that defendants violated the First Amendment, which is applicable to states through the Fourteenth Amendment.[4] The parties dispute the standard applicable to this claim. Plaintiff lobbies for a traditional, forum-based analysis, while defendants urge the Court to apply the balancing test established in *Pickering v. Board of Education,* 391 U.S. 563 (1968).

---

[4] The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Section 1 of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The term "'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995).

The issue is easily resolved in defendants' favor because the Ninth Circuit has provided clear guidance on this very issue. In *Johnson v. Poway Unified School District*, 658 F.3d 954, 961 (9th Cir. 2011), the court held that that a forum-based analysis is not appropriate "where the government acts as both sovereign *and employer*, . . . ." *Id.* (citations omitted). Instead, courts must apply a *Pickering* balancing analysis, which ultimately "reconcile[s] the employee's right to engage in speech and the government's right to protect its own legitimate interests in performing its mission.'" *Id.* at 961 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)).

In the Ninth Circuit, the *Pickering* balancing test involves a sequential, five-step inquiry, which asks:

(1) whether the plaintiff spoke on a matter of public concern;

(2) whether the plaintiff spoke as a private citizen or public employee;

(3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;

(4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and

(5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

In *Johnson*, a school district prohibited a math teacher from hanging two large religious banners in his math classroom.[5] The district court determined that the school

---

[5] The two banners – which were each seven feet wide by two feet tall – stated, in large type: (1) IN GOD WE TRUST; ONE NATION UNDER GOD; GOD BLESS AMERICA; AND GOD SHED HIS GRACE ON THEE*; and (2) All men are created equal, they are endowed by their CREATOR. *Johnson*, 658 F.3d at 958.

district violated Johnson's First Amendment rights by forcing him to remove the banners. The Ninth Circuit reversed, holding that the district court erred at the outset by applying a forum-based analysis, rather than a *Pickering*-based inquiry. As the Ninth Circuit explained:

> To some degree, we can understand the district court's mistake. An analysis of the government's regulation of speech ordinarily hinges on the context, or forum, in which the speech takes place. Under that traditional rubric, the government's power is at its least when speech takes place in a public forum, is greater when it is regulating speech in a limited public forum, and is at its greatest when regulating speech in a non-public forum. However, the Supreme Court has held that where the government acts as both sovereign *and employer*, this general forum-based analysis does not apply.

*Id.* at 961 (citations and paragraph division omitted). The court concluded that Johnson could not survive a *Pickering* analysis because he was not speaking as a private citizen: "Certainly, Johnson did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher – a government employee. Similarly, Johnson did not act as an ordinary citizen when 'espousing God as opposed to no God' in his classroom." *Id.* at 968 (internal citations omitted).

In determining that there was "no justifiable cause" for the district court's refusal to apply *Pickering* to Johnson's job-related speech, the court relied in part on *Downs v. Los Angeles Unified School District,* 228 F.3d 1003 (9th Cir. 2000). *Downs* is instructive here because it recognized that the threshold inquiry in government-employee speech cases is whether the citizen or the government is speaking. *Johnson,* 658 F.2d at 962 n.7 (citing *Downs,* 228 F.3d at 1011-12). If the government is the speaker, the speech "is not

subject to the constraints of constitutional safeguards and forum analysis, . . . ." *Downs*, 228 F.3d at 1013. As *Downs* put it, "[s]imply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist." *Id.*

In *Downs*, a public high school created bulletin boards for the purpose of recognizing Gay and Lesbian Awareness month. The content of the boards was subject to the school principal's oversight. Downs, a high school teacher who objected to recognition of Gay and Lesbian Awareness, created a competing bulletin board in the school titled "Redefining the Family." *Id.* at 1006. He sued after the school ordered him to remove his materials. *Id.* at 1007. The *Downs* Court concluded that the bulletin boards were school speech and, as such, the school was well within its rights to make content-based choices regarding what it had to say on the boards.[6] *Id.* at 1013.

As in *Downs,* where the school elected to speak through bulletin boards, ISU opened its mouth to speak by creating a moderated listserv, which sends emails messages with ISU signage.[7] Plaintiff contends that the messages actually are not the university's voice because the university itself did not author the individual messages and the reader can easily discern that.

---

[6] Here, plaintiff has essentially conceded that the speech at issue is ISU's speech under *Down*s. That is, the faculty association admits that because its members "wish to speak as public employees," they cannot satisfy the second step of the *Pickering* analysis. (Recall, the second step asks whether the individual wishes to speak as a private citizen or a public employee). As Johnson explains, *Downs* largely controls step two of the *Pickering* analysis. *See Johnson*, 658 F.3d at 962 n.7.

[7] The sample emails submitted to the Court show that an email sent via the facultymemos list will have a subject line prefaced with the notation: [Facultymemos]. The "To:" line also

But that argument misses the point. If it is known that the listserv is moderated, it is reasonable to infer that recipients will recognize messages to be university-approved, even if another person actually wrote the message. In *Downs,* the high school did not create each individual posting on the bulletin boards either. The point was that the school could decide what *it* wanted to say on the boards. It could do that by choosing to post some messages, while rejecting others.

In sum, given the clarity of the Ninth Circuit's instructions in both *Johnson* and *Downs,* the Court concludes that *Pickering* supplies the governing legal framework.

Plaintiff's citation to *Rodriguez v. Maricopa County Community College District,* 605 F.3d 703 (9th Cir. 2010) does not persuade the Court otherwise. Among other things, *Rodriguez* does not directly address whether courts should apply a *Pickering* balancing test, or a forum-based analysis in the context of public employees' free speech rights.

In *Rodriguez,* Hispanic employees sued a college district, contending that the district's failure to properly respond to a professor's racially charged emails created a hostile work environment in violation of Title VII and the Equal Protection Clause. The court held that the professor's speech was not unlawful harassment. Within that case, the plaintiffs asserted that the college could have applied its harassment policy to suppress the professor's speech because he spoke in a limited or nonpublic forum. The *Rodriguez* Court assumed that the email list and servers were limited and nonpublic forums and then

indicates that it is to "facultymemos." *See, e.g., Ex. B. to Feb. 13, 2012 Cole Aff.*, Dkt. 2-2.

held that "state actors may not suppress speech because of its point of view, and that is exactly what application of the harassment policy to [the professor's] emails and website would have done." *Id.* at 710 (omitting internal citation to *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 49 (1983).

There are two problems with plaintiff's reliance on this portion of the *Rodriguez* opinion. First, *Rodriguez* dealt with a school's general internal email system. ISU's email system and servers – generally speaking – are not at issue here. Plaintiffs do not contend that they have been deprived access to that system. Rather, the dispute relates to the professors' insistence that they have the right to distribute the email communications via the university's official facultymemos listserv. As already noted, ISU indicates that sending a message through facultymemos has the effect of making the email appear as an administration-sanctioned communication. *Rodriguez* did not directly face that issue. *Cf. Rodriguez*, 605 F.3d at 710 ("Although Kehowski disseminated his views using the district's web servers and email list, providing such resources on a content-neutral basis to facilitate campus discussion does not suggest official endorsement of the resulting speech.").

Second, plaintiff overlooks the *Rodriguez* Court's observation that the college could have chosen to suppress the professor's speech by limiting discussion on its email list and web servers to official school business. Id. at 710 ("We assume the First Amendment would not prevent the district from restricting use in that manner."). That is precisely what the university chose to do here.

Finally, the Court rejects plaintiff's alternative argument that it can succeed under

the *Pickering* balancing analysis as modified *in United States v. National Treasury Employees Union*, 513 U.S. 454 (1995). Broadly speaking, both *Pickering* and *National Treasury* concern the scope of free-speech rights enjoyed by public employees. To greatly oversimplify, *Pickering* applies to speech that has already taken place, while *National Treasury* applies when a prior restraint is placed on employee speech.

  *National Treasury* imposes a significantly greater burden on the government. In a traditional *Pickering* analysis, the government need only prove that its interest, as an employer, in promoting the efficiency of the public services it performs outweighs plaintiff's interest in speaking. If *National Treasury* applies, the government must show its restriction is necessary to prevent the actual disruption of its operations as an employer.

  The problem with plaintiff's argument is that *National Treasury* and *Pickering* share the same threshold test. To reach the balancing part of either test, plaintiffs must first demonstrate that they spoke (or wished to speak) *as citizens* on matters of public concern. *See, e.g., Nat'l Treasury*, 513 U.S. at 465-66. Here, plaintiff concedes that its members wished to speak as public employees. As the Supreme Court has held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006). Plaintiff's *National Treasury* argument thus fails at the outset. *See also City of San Diego v. Roe*, 543 U.S. 77, 81 (2004) (lower court's reliance on *National Treasury* was "seriously misplaced" because plaintiff's speech was related to his employment); *Dible v. City of Chandler*, 515 F.3d 918, 927 (9th Cir. 2008) (*National Treasury*

inapplicable because police officer's speech was employment-related).

For all the above reasons, the Court concludes that there has been no violation of the First Amendment in this case.

## C.     Plaintiff's Due Process Claim

Plaintiff alleges that defendants violated its members' procedural due process rights because their "access to ISU's mail system has been terminated without any process." *Reply*, at 9. This is not entirely accurate, however. The university is allegedly refusing to allow some professors to send particular messages through a particular listserv; there is no allegation that members' "network and Internet" privileges have been revoked. *See ISU Policies & Procedures,* Dkt. 2-2, at 10 (paragraph 5.b).

The procedural due process guarantees of the Fourteenth Amendment apply only when a constitutionally protected liberty or property interest is at stake. *See, e.g., Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). Constitutionally protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id*. at 577. Yet "not all state-created rights rise to the level of a constitutionally protected interest." *Brady v. Gebbie*, 859 F.2d 1543, 1548 n.3 (9th Cir. 1988). The question whether a state-created right triggers constitutional protections is a question of federal constitutional law. *Id*.

Here, plaintiff has failed to show its members have a protected property interest in the right to use facultymemos. As noted, the applicable policies speak broadly to "providing access" to information technology services, and they "encourage" those who "regularly send messages to groups of ten or more to use the mailman mailing list

utility." *ISU Policies & Procedures*, Dkt. 2-2, at 10-11 (¶¶ 5.b. and 6a.(3)). It is not clear, however, that revoking the right to use a particular Mailman list invokes the "due process procedures" referenced in the policies. This is particularly true here, given that facultymemos is a moderated list, and the university chooses which messages it will (and will not) convey through the list..

For the above reasons, the Court concludes that there has been no violation of Due Process in this case.

## CONCLUSION

In accordance with the Memorandum Decision set forth above, the Court concludes that, under the facts stipulated to by the parties in this matter, there has been no violation of either the First Amendment or the Due Process Clause. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: April 17, 2012

Honorable B. Lynn Winmill
Chief U. S. District Judge